# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DONNA GOOD,
        Plaintiff,

    vs

COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

Case No. 1:11-cv-464

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 14) and the Commissioner's response in

opposition. (Doc. 15).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in October 2006, alleging disability since

June 19, 2003, due to arthritis, bipolar disorder, RLS (restless leg syndrome), asthma and

bronchitis.[1] (Tr. 203, 234). Plaintiff's applications were denied initially and upon

reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before

administrative law judge (ALJ) Samuel A. Rodner. Plaintiff and a vocational expert (VE)

appeared and testified at the ALJ hearing. On April 29, 2010, the ALJ issued a decision denying

---

[1] Plaintiff previously filed an application for benefits on July 13, 2005. (Tr. 170-78, 219-20). The ALJ re-opened that application given that two applications were filed within a twelve month period. (Tr. 12).

plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

### A. Mental Impairments

In February 2004, while incarcerated at the Ohio Reformatory for Women, plaintiff underwent a mental health evaluation by Dr. Nalluri. (Tr. 327-34). Dr. Nalluri diagnosed plaintiff with depression, rule out chronic, and cocaine dependence. (Tr. 333). Plaintiff was assigned a Global Assessment of Functioning (GAF) score[2] of "50/70." (Tr. 337). While incarcerated, plaintiff received anti-depressant medication (Tr. 310-11, 700, 703, 711, 713) and attended therapy with a social worker. (Tr. 654-67).

Plaintiff was re-evaluated in October 2004 by Kurt W. Heintzelman, M.D. (Tr. 321-26). Plaintiff was reported as being adequately groomed, pleasant, with a calm and appropriate affect and logical thought process, and in a "pretty good mood." (Tr. 324). Dr. Heintzelman diagnosed plaintiff with bipolar disorder NOS provisionally, rule out cyclothymia, and polysubstance dependence. (Tr. 325). He assigned plaintiff a GAF score of 65 at the most, and altered her medication regimen. (*Id.*).

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." (*Id.*). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. (*Id.*). The DSM-IV categorizes individuals with GAF scores of 61 to 70, as having "some mild" symptoms who are "generally functioning pretty well." *See* DSM-IV at 32.

Plaintiff completed her sentence at Pathways halfway house through Talbert House from June 2005 through November 2005. (Tr. 389-406). Upon discharge from the program, her social worker noted that plaintiff had the goals of obtaining employment, a sponsor, and housing. (Tr. 389). Plaintiff found a job at Frisch's and maintained employment until she was offered a better position at Bob Evans. (*Id.*). While at Pathways plaintiff participated in groups; processed well in individual sessions; acted as a leader; and completed the program with only one incident with another client. (*Id.*). Her social worker concluded that plaintiff did very well in the program. (*Id.*).

In September 2005, plaintiff was evaluated by W. Michael Nelson, Ph.D., a licensed psychologist. (Tr. 352-58). Plaintiff reported having approximately 20 jobs previously and reported no psychologically-based difficulty maintaining employment. (Tr. 352-53). Dr. Nelson noted that plaintiff was adequately groomed; had intelligible and fairly spontaneous speech; had coherent and relevant thought processes; and presented with a good affect. (Tr. 354). Further, plaintiff was reported as being oriented as to person, time, and place with adequate remote memory; having the capacity of functioning in "at least" the low average range; and having fair insight and sufficient judgment. (Tr. 355). Dr. Nelson opined that plaintiff was moderately impaired in her ability to relate to others, including fellow workers and supervisors; not impaired in her ability to understand, remember, and follow instructions; not impaired in her abilities to maintain attention, concentration, persistence, and pace to perform simple, repetitive and/or routine tasks; and moderately impaired in her ability to withstand the stress and pressure associated with day-to-day work. (Tr. 357). Dr. Nelson diagnosed plaintiff with mood disorder

NOS; post-traumatic stress disorder (PTSD); and alcohol/cocaine dependence (reportedly in remission since 2003). (*Id.*). Dr. Nelson further found that plaintiff manifested some maladaptive personality deficits that were of insufficient severity to warrant a formal diagnosis. (Tr. 357-58). He assigned plaintiff a GAF score of 53. (Tr. 357-58).

In February 2007, John Heideman, Psy.D., evaluated plaintiff on behalf of the state agency. (Tr. 463-70). Dr. Heideman reported that plaintiff was "marginally" cooperative and that she made sarcastic comments and prevaricated routinely. (Tr. 468). He further reported that plaintiff spoke impulsively and unapologetically; displayed rambling thoughts; answered questions in devious manner; and "tended to over-endorse symptoms." (*Id.*). Dr. Heideman diagnosed plaintiff with a pain disorder associated with both psychological factors and a general medical condition; polysubstance dependence in sustained partial remission; PTSD, chronic; dysthymic disorder, early onset; borderline intellectual functioning; and a personality disorder. (Tr. 469). He assigned plaintiff a GAF score of 52. (*Id.*). Dr. Heideman opined that plaintiff was moderately impaired in social functioning; moderately impaired in her ability to understand, remember and follow instructions due to her borderline intellectual functioning; and moderately impaired in her ability to maintain attention, concentration, persistence and pace. (Tr. 470). Dr. Heideman also opined that plaintiff had a moderate-to-marked impairment in her ability to withstand the stress of daily work based on her report of a problem at a past job that led to criminal charges and jail time. (*Id.*). Dr. Heideman concluded that plaintiff was not "considered to be reliable or retainable." (*Id.*).

4

In April 2007, nonexamining agency psychologist, Carl Tishler, Ph.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity (RFC) Assessment based on plaintiff's mental health treatment records during her incarceration and subsequent counseling and her consultative evaluations with Dr. Nelson and Dr. Heideman. (Tr. 481-93; 495-98). Dr. Tishler opined that plaintiff had mild limitations in her activities of daily living and moderate limitations in her social functioning and in her ability to maintain concentration, persistence or pace. (Tr. 491). Dr. Tishler disagreed with Dr. Heideman's diagnosis of borderline intellectual functioning, noting that Dr. Heideman had not considered evidence such as plaintiff's activities of daily living and work history. (Tr. 497). Due to some inconsistencies, Dr. Tishler opined that plaintiff's statements are not considered fully credible. (*Id.*). Dr. Tishler found plaintiff displayed good insight and judgment and her attention and concentration were both good. (*Id.*). Dr. Tishler concluded that plaintiff could perform simple routine tasks and would do best in small group or solitary settings. (*Id.*). In December 2007, state agency psychologist Tasneem Khan, Ed.D., affirmed Dr. Tishler's assessment. (Tr. 508).

Plaintiff entered into a semi-incarceration program at the MonDay Community Correctional Institution from June 4, 2009 to November 12, 2009. (Tr. 560-79). She was initially diagnosed with cocaine dependence. (Tr. 561). During her incarceration, plaintiff was noted to be "very enthusiastic and helpful whenever needed," including participating as a "Big Sister" to a new resident. (Tr. 562). She also completed 32 hours of community service at the local Humane Society. (*Id.*). The discharge report stated that she had successfully completed most goals and only committed two minor rule violations. (*Id.*).

Plaintiff was assessed by a counselor at Centerpoint Health in February 2010. (Tr. 731-39). The counselor noted that plaintiff had an appropriate appearance and affect; cooperative behavior and attitude; good impulse control; clear and coherent stream of thought; intact memory; adequate insight; and oriented times three. (Tr. 731). The counselor determined that that based on plaintiff's Ankylosing Spondylitis and family history, she had a mood disorder. (*Id.*). She was assigned a GAF score of 52. (Tr. 736).

## B. Physical Impairments[3]

While incarcerated in 2004, plaintiff was prescribed an Albuterol inhaler for asthma. (Tr. 308-315, 719). In February 2004, her examination revealed clear lungs. (Tr. 316). Treatment notes reveal that plaintiff's peak flow readings were consistently 95% or higher. (Tr. 719).

Plaintiff presented to the emergency room at the University Hospital in June 2005 with a complaint of low back pain. (Tr. 370-72). During examination her pulse oximetry[4] reading was 98% and her lungs were clear. (Tr. 371). When seen again in the emergency room the following month, her pulse oximetry reading was 97% and her lungs were clear. (Tr. 373-75). In October and December 2005, plaintiff's lungs were clear. (Tr. 378, 381).

Plaintiff began seeing primary care doctor, Margaret Atterbury, M.D., in August 2005 at the Braxton Cann Medical Center/Cincinnati Health Department. (Tr. 407-17). After seeing plaintiff once, Dr. Atterbury completed a medical source statement for the Hamilton County

---

[3] Regarding her physical impairments, plaintiff's Statement of Errors is limited to the ALJ's findings with respect to her asthma and pulmonary disaease. Accordingly, the Court will focus its review of the medical evidence relating to plaintiff's breathing impairments.

[4] Pulse oximeters measure the percentage of oxygenated hemoglobin in a patient's blood and are used to assess the severity of asthma and COPD. *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1472779/ (last visited June 21, 2012).

Health and Human Services Department, dated August 25, 2005. (Tr. 364-65). Dr. Atterbury reported findings of a clear chest, moderate edema in both hands, and decreased range of motion in the right shoulder. (Tr. 364). Dr. Atterbury opined that plaintiff could not lift even five pounds; that pushing/pulling, bending, and repetitive foot movements were all extremely limited; and reaching, handling, and repetitive foot movements were markedly limited. (Tr. 365). She opined that plaintiff was rendered unemployable for at least twelve months or more. (*Id.*). In September 2005, plaintiff reported to Dr. Atterbury that she was in constant pain and had been diagnosed with ankylosing spondylitis.[5] (Tr. 413-14).

In September 2005, Jennifer Wischer-Bailey, M.D., examined plaintiff for disability purposes. (Tr. 343-51). Plaintiff reported a long history of shortness of breath which had increased in severity during the last three years and stated she has had asthma "all my life." (Tr. 343). Plaintiff also reported that she can ambulate on level terrain for no more than one block without associated shortness of breath, and this symptom increased upon climbing stairs or walking up grades. (*Id.*). She was able to perform housework and shopping unassisted. (*Id.*). She noted a two year history of a chronic cough which was nonproductive. (*Id.*). Plaintiff denied chest pain and reported smoking one pack of cigarettes daily for 20 years. (*Id.*). Plaintiff reported that she had never been hospitalized for respiratory problems. (*Id.*). On examination, her lungs were clear. (Tr. 344). As to her breathing impairment, plaintiff was diagnosed with "shortness of breath, normal respiratory examination." (Tr. 345). Dr. Wischer-Bailey concluded

---

[5] Ankylosing spondylitis is a long-term disease that causes inflammation of the joints between the spinal bones and the joints between the spine and pelvis. It eventually causes the affected spinal bones to join together. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001457/ (last visited June 21, 2012).

7

that plaintiff was comfortable in both the sitting and supine positions and that her breath sounds were clear. (*Id.*). Plaintiff was not dyspneic with exertion and there was no evidence of wheezing. (*Id.*). Dr. Wischer-Bailey opined that plaintiff's discontinuation of the use of tobacco products would be beneficial. (Tr. 346).

In December 2005, plaintiff presented to the emergency room at the Jewish Hospital for hip and leg pain. (Tr. 433-35). Her lungs were clear on examination, and her oxygen saturation was 100%. (Tr. 433). Plaintiff returned to the emergency room in February 2006 with a complaint of back pain and her lungs were clear on examination. (Tr. 431-32).

The record also contains treatment notes from James E. Lang, M.D., at Greater Cincinnati Internal Medicine dated from August 1999 to December 2007. (Tr. 436-44, 509-58). When seen by Dr. Lang in March, April and October 2006, examinations revealed that plaintiff's lungs were clear. (Tr. 439-41). Dr. Lang's primary diagnoses in June 2007 were severe back and hip pain. (Tr. 512).

In August 2006, plaintiff presented to the emergency room with complaints of back pain. (Tr. 423-24). She denied shortness of breath, had clear lungs, and her pulse oximetry reading was 98%. (Tr. 423). When seen in the emergency room in September 2006, her lungs were clear. (Tr. 421).

Consultative physician, Loraine Glaser, M.D., a specialist in internal medicine, examined plaintiff for disability purposes and prepared a report dated March 12, 2007. (Tr. 473-80). On physical examination, Dr. Glaser found a moderately obese middle-aged woman who ambulated with an antalgic gait, and was comfortable in both the sitting and standing positions. (Tr. 474).

8

Plaintiff's memory, ability to relate, appearance and orientation were reported as "good." (*Id.*). Plaintiff was reported as having a frequent congested cough but she denied shortness of breath. (Tr. 473-74). Dr. Glaser noted wheezes and diminished breath sounds. (Tr. 474). She diagnosed plaintiff with, *inter alia*, "probable acute bronchitis with ongoing tobacco abuse." (Tr. 475).

In April 2007, plaintiff presented to the emergency room with complaints of back pain. Plaintiff's lungs were clear and her pulse oximetry reading was 98%. (Tr. 523-24).

On June 1, 2007, Audrius Ruksenas, M.D., a doctor in Dr. Lang's practice, diagnosed plaintiff with chronic obstructive pulmonary disease (COPD). (Tr. 518).

State agency physician Paul Morton, M.D., reviewed the file on May 1, 2007, and completed a physical residual functional capacity assessment. (Tr. 500-06). He opined that plaintiff could perform a range of light work and noted there was no evidence of pulmonary disease and no mention of treatment for asthma or chronic bronchitis in the record. (Tr. 501). Plaintiff's chest x-ray was normal and there was no evidence of severity relative to asthma or chronic bronchitis. (*Id.*). State agency physician Walter Holbrook, M.D., affirmed Dr. Morton's opinion in January 2008. (Tr. 529).

Plaintiff saw internist Umakant Patel, M.D., for her back pain twice in January 2010, but she did not complain of breathing problems and Dr. Patel noted that her lungs were normal upon examination. (Tr. 547-51). Plaintiff also saw Bernard Lenchitz, M.D., in January 2010 and he reported clear lungs and normal respiratory effort. (Tr. 586).

9

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A)

(DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the

work previously performed or in any other substantial gainful employment that exists in the

national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-

(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.*; *Wilson* v. *Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir.

1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2. The claimant has not engaged in substantial gainful activity since June 19, 2003, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: morbid obesity, degenerative disc disease of the cervical and lumbar spine with radicular complaints, degenerative joint disease of the left hip, a pain disorder associated with both psychological factors and general medical condition, polysubstance abuse reportedly in sustained remission, posttraumatic stress disorder (PTSD), a dysthymic disorder, and a personality disorder, NOS (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, she can lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; only occasionally balance,

11

stoop, kneel, crouch, crawl, or climb ramps/stairs; and never climb ladders/ropes/scaffolds. She also has limited peripheral vision. Due to her mental impairments, she is able to understand and follow simple and more complex oral and written instructions. She has an intact memory. She is able to sustain concentration and attention for at least simple, routine work duties. She must work in small group settings or solitary settings. She is able to at minimum handle the demands of simple, routine tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[6]

7. The claimant was born [in] 1960 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[7]

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 19, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-26).

---

[6] Plaintiff has past relevant work as a food service waitress. (Tr. 74, 204).

[7] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 2,150 unskilled light jobs in the regional economy, citing as examples of such jobs assembler, packer and utility worker. (Tr. 25, 74-78).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

13

**D. Specific Errors**

On appeal, plaintiff raises two assignments of error: (1) the ALJ erred in failing to find that plaintiff's asthma and COPD were severe impairments; and (2) the ALJ improperly weighed the medical opinions in the record. Specifically, plaintiff maintains that the ALJ failed to properly explain how much weight he assigned to the various opinion statements within the record and unreasonably chose to rely primarily on the opinion of the state-agency reviewing physicians, which conflicted with the opinions of the treating and examining physicians and was not well-supported by the evidence.

1. The ALJ's determination that plaintiff's COPD and asthma are not severe impairments is supported by substantial evidence.

Plaintiff asserts the ALJ erred by not finding that her COPD and asthma, or reactive airway disease (RAD), were not severe impairments at Step Two of the sequential disability analysis. In support, plaintiff identifies three treatment notes that reflect findings or reports of shortness of breath (Tr. 315, 381, 413) and Dr. Ruksenas' diagnosis that plaintiff suffers from COPD. (Tr. 518). For the reasons that follow, the undersigned finds that the ALJ did not err in determining that plaintiff's COPD and asthma were not severe impairments.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability

14

to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1521(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Sec'y of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a *"de minimus* hurdle"* in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers*, 486 F.3d at 243 n.2.

With respect to her COPD, plaintiff appears to argue that her "official diagnosis of COPD" is sufficient evidence supporting a determination that this condition is severe. (Doc. 14, p. 9). Plaintiff's argument is not well-taken. As noted by the Commissioner in his response to plaintiff's Statement of Errors, the only evidence in the record regarding plaintiff's COPD is the June 1, 2007 diagnosis from Dr. Ruksenas. *See* Tr. 518. There is no evidence of record that plaintiff's COPD functionally limits plaintiff's ability to do work and this diagnosis, standing alone, is insufficient to establish that the impairment is severe. *See Higgs*, 880 F.2d at 863. ("the mere diagnosis of [an impairment], of course, says nothing about the severity of the

15

condition."). *See also Young v. Sec'y of H.H.S*, 925 F.2d 146, 151 (6th Cir. 1990) (diagnosis of impairment does not indicate severity of impairment).

With respect to plaintiff's asthma, the record demonstrates that plaintiff has been prescribed inhalers and nebulizer treatments for asthma (Tr. 308-15, 719), but there is no evidence that she has required further treatment for this condition nor is there any medical opinion that it impairs her functional abilities.

In finding these conditions to be non-severe, the ALJ considered the COPD diagnosis and plaintiff's asthma treatment and reasonably noted that "there is no objective medical evidence of any pulmonary disease [and, f]urther, the record does not contain any actual treatment records for [plaintiff's] respiratory condition." (Tr. 17). The ALJ also noted that the evidence of record demonstrates that plaintiff has consistently had normal respiratory signs and normal pulse oximetry at room temperature. *Id.* (citing Tr. 371, 374, 421).

The ALJ's non-severity finding is supported by substantial evidence. As detailed above, despite plaintiff's numerous emergency room visits and reports of shortness of breath, the clinical findings were unremarkable. *See* 20 C.F.R. § 404.1508 (impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, and not solely by claimant's statement of symptoms); § 404.1528(a) (claimant's own description of impairment is not enough to establish existence of that impairment). Likewise, examination results consistently revealed that plaintiff had normal pulse oximetry readings (Tr. 423, 433, 523-24, 719) and clear lungs. (Tr. 316, 345, 364, 371, 373-75, 378, 381, 421, 423, 431-33, 439-41, 523-24, 547-51, 586). Plaintiff's reports also belie her assertion that her asthma is a severe impairment. *See* Tr.

16

343 (plaintiff reported in September 2005 that she had never been hospitalized for respiratory problems); Tr. 423 (plaintiff denied having shortness of breath in August 2006); Tr. 473-74 (in March 2007, plaintiff denied shortness of breath despite having a congested cough). While plaintiff was diagnosed with "shortness of breath, normal respiratory examination" in September 2005, the examining physician opined that this could be addressed by discontinuing the use of tobacco. (Tr. 346). Similarly, in March 2007, Dr. Glaser noted wheezing and diminished breath sounds but opined that this was likely acute bronchitis resulting from plaintiff's ongoing tobacco use. (Tr. 474-75). Plaintiff's claim of severe respiratory impairments is further undermined by her failure to comply with physicians' directions to quit smoking. *See Hardaway v. Sec'y of H.H.S.*, 823 F.2d 922, 927 (6th Cir. 1987). Finally, there is no medical evidence that plaintiff's asthma and/or COPD limited her functional abilities, nor has plaintiff suggested any additional limitations the ALJ should have considered based on her respiratory impairments.

Accordingly, the Court finds that the ALJ's determination that plaintiff's asthma and COPD are not severe impairments is supported by substantial evidence and should be affirmed.

2. The ALJ did not err in weighing the medical opinions of record or in formulating plaintiff's RFC.

Plaintiff contends the ALJ failed to properly explain the weight he assigned to the medical opinions of record. Plaintiff also argues the ALJ erred by relying primarily on the opinions of nonexamining reviewing doctors which conflicted with the opinions of her "treating" and examining doctors. (Doc. 14, p. 7). Specifically, plaintiff asserts the ALJ should have given greater weight to the opinion of consultative examiner Dr. Heideman, whose opinion

supports a more restrictive RFC than the one formulated by the ALJ. Lastly, plaintiff contends that the ALJ erred in giving "great weight" to the opinion of Dr. Tishler, the reviewing agency psychologist, claiming that his opinion misstated the findings of Dr. Heideman and is contrary to the record.[8] For the reasons that follow, the undersigned finds that the ALJ did not err in weighing the opinions of record or in formulating plaintiff's RFC.

As an initial matter, plaintiff's argument that the ALJ failed to properly explain how much weight he assigned to the opinions of record is without merit. The ALJ decided to give "great weight" to the opinion of the nonexamining agency psychologist, Dr. Tishler, and "reduced weight" to the opinion of Dr. Heideman, a one-time examining psychologist. To the extent plaintiff makes a semantic argument regarding the ALJ's use of the terms "great weight" and "reduced weight," this argument is not well-taken. The terms "great weight" and "reduced weight" are commonly used by ALJs in disability decisions when weighing medical opinions. District courts in the Sixth Circuit have previously recognized that when an ALJ gives "great weight" to a medical opinion that means it is given more than "reduced weight." *See, e.g.*, *Thomas v. Astrue*, No. 1:10-cv-80, 2011 WL 4632009, at *6 (N.D. Ohio Sept. 30, 2011). Accordingly, the undersigned finds that, with respect to this distinct issue, the ALJ's decision comports with the applicable regulations and rulings governing how the Commissioner is to weigh medical opinions of record.

---

[8] The Court notes that plaintiff has not identified any treating physician opinion that the ALJ allegedly failed to properly weigh. Plaintiff's failure to present a developed argument regarding how the ALJ weighed any other medical opinion of record amounts to a waiver. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Consequently, the Court will only address the issue briefed by plaintiff, *i.e.*, whether the ALJ erred in assigning "great weight" to Dr. Tishler's opinion and "reduced weight" to Dr. Heideman's opinion.

The Social Security regulations set forth the three types of acceptable medical sources upon which an ALJ may rely on: treating sources, nontreating sources, and nonexamining sources. *See* 20 C.F.R. §§ 404.1502, 416.902, 404.1513(a), 416.913(a). When treating sources offer opinions, the Social Security Administration is to give such opinions the most weight and is procedurally required to "give good reasons . . . for the weight [it gives the claimant's] treating source's opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d at 875. This "good reasons" requirement applies only to treating source opinions. *Id.* at 876. "With regard to nontreating, but examining, sources, the agency will simply generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined [her]." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)) (internal citations omitted). In determining the weight to give medical source statements, the ALJ must consider "factors including the length and nature of the treatment relationship, the evidence that the [examiner] offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the [examiner] was practicing in her specialty." *Ealy*, 594 F.3d at 514; *see also* 20 C.F.R. §§ 416.927(c), 404.1527(c).

In the instant case, the record demonstrates that the ALJ considered the relevant factors in his determination to credit the opinion of Dr. Tishler over that of Dr. Heideman. First, the ALJ acknowledged the "length and nature" of plaintiff's treatment relationship with Dr. Heideman and Dr. Tishler. While plaintiff's Statement of Errors attempts to cast Dr. Heideman as a treating physician, the record demonstrates that he only evaluated plaintiff on one occasion and, consequently, he is properly considered a one-time examiner and not a treating physician. *See*

20 C.F.R. §§ 404.1527(c), 416.927(c). Consequently, his opinion is not entitled to any special deference. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2), *Kornecky v. Commissioner*, 167 F. App'x 496, 506-507 (6th Cir. 2006) ("a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship") (citing *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005); *Cunningham v. Shalala*, 880 F. Supp. 537, 551 (N.D. Ill. 1995)). *See also Crawford v. Commissioner*, 363 F.3d 1155, 1160 (11th Cir. 2004); *Duyck v. Chater*, 907 F. Supp. 338, 342 (D. Oregon 1995). Dr. Heideman's opinion was not based on a history of treatment and examination of plaintiff which would place him in a better position vis-à-vis the other mental health providers of record to assess the severity of and limitations surrounding plaintiff's impairments. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Rather, his opinion was primarily based on a one-time evaluation and plaintiff's subjective statements and the ALJ appropriately noted this in weighing Dr. Heideman's opinion. In contrast, Dr. Tishler's opinion was based on a review of several years of plaintiff's treatment records from June 19, 2003 to April 23, 2007, including Dr. Heideman's evaluation – which Dr. Tishler specifically stated was inconsistent with other evidence and plaintiff's reported activities of daily living. (Tr. 497). A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons why his opinion differs from that of the examining physician or where the non-examining doctor's opinion is based on a review of the complete record unavailable to the examining doctor. *See Barker*, 40 F.3d at 794; *Blakley*, 581 F.3d at 409 (citing SSR 96-6p). The ALJ took into account the "length and nature" of these

treatment relationships in determining to give greater weight to Dr. Tishler's opinion due to, in part, the fact that his opinion was based on a review of a more complete record.

Second, the ALJ considered the evidence supporting the two opinions. While Dr. Heideman opined that plaintiff was neither retainable nor reliable, the ALJ reasonably determined that these findings were largely based on plaintiff's subjective statements and her report that she had previously been fired from a job for losing her temper and had been arrested and convicted. (Tr. 24, citing Tr. 470). Further, the ALJ noted that Dr. Tishler's opinion was based on his review of nearly four years of plaintiff's mental health treatment records.

Third, the ALJ determined that Dr. Tishler's assessment was consistent with plaintiff's "longitudinal treatment history and her testimony[,]" while Dr. Heideman's findings were inconsistent with the other evidence of record. (Tr. 23-24). The record evidence substantially supports the ALJ's finding. For example, while Dr. Heideman opined that plaintiff would be difficult to work with, was not "retainable,"[9] and suffered from borderline intellectual functioning (Tr. 468-70), these findings are contradicted by other substantial evidence of record. As the ALJ reasonably found, "[n]o treating mental health professional or past consultative psychological evaluator has noted borderline intellectual functioning. In addition, at the hearing, the [plaintiff] testified that she has taken some college-level courses, which is not consistent with borderline intellectual functioning." (Tr. 17). In addition, plaintiff reported to Dr. Nelson that

---

[9] Dr. Heideman's opinion that plaintiff is "not retainable" (Tr. 470) is entitled to no deference because it is the prerogative of the ALJ to make the ultimate disability determination. *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Warner v. Comm'r*, 375 F.3d 387, 390 (6th Cir. 2004).

she had no psychologically-based difficulty maintaining employment (Tr. 352-53); records from Talbert House demonstrate that plaintiff was a leader during her treatment (Tr. 389); treatment notes during plaintiff's incarceration document that plaintiff was "enthusiastic and helpful," acted as a 'Big Sister' to a new resident, and completed 32 hours of community service (Tr. 562); and the most recent notes regarding plaintiff's mental health treatment indicate that she currently has no active psychiatric issues. (Tr. 581). Further, Dr. Tishler opined that plaintiff had good memory, judgment, and insight and fair-to-good attention and concentration.[10] (Tr. 497). All of these factors substantially support the ALJ's decision in this case.

It is the ALJ's function to resolve inconsistencies and conflicts in the medical evidence, *see King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984), and the record reveals that the ALJ properly considered the totality of the evidence in the record in weighing the opinions of Dr. Heideman and Dr. Tishler and in assessing plaintiff's RFC. Contrary to plaintiff's assertion, the ALJ provided sufficient reasons for giving "reduced weight" to Dr. Heideman's findings, namely the inconsistency with his findings and the totality of the evidence, including plaintiff's own testimony. The Court finds that the ALJ did not err in giving more weight to the opinion of the reviewing psychologist, Dr. Tishler, than to the opinion of the one-time examiner Dr. Heideman. Accordingly, the ALJ's decision complies with the requirements of 20 C.F.R. §§ 404.1527(c)

---

[10] Plaintiff argues that these findings are "exactly contrary to Dr. Heide[ ]man's report . . . that [plaintiff's] attention and concentration were both moderately to markedly impaired." (Doc. 14, p. 9). Plaintiff misstates the record and fails to recognize that Dr. Tishler based his findings on his review of plaintiff's entire treatment history, not solely on Dr. Heideman's one-time evaluation. Dr. Heideman opined that plaintiff was only moderately impaired in her ability to maintain attention, concentration, persistence and pace, not moderately to markedly impaired. *See* Tr. 470. Further, other evidence of record, namely Dr. Nelson's 2005 opinion, include findings that plaintiff has no impairment in her ability to maintain attention, concentration, persistence and pace. *See* Tr. 357.

22

and 416.927(c) and is substantially supported by the evidence as a whole.  Plaintiff's second assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 7/9/2012

Karen L. Litkovitz
United States Magistrate Judge

23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DONNA GOOD,
      Plaintiff,

      vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:11-cv-464
Barrett, J.
Litkovitz, M.J.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).